**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

**Nos. 12-1224 and 14-1020 (consolidated)**

# In the United States Court of Appeals for the District of Columbia Circuit

---

MIDLAND COGENERATION VENTURE LIMITED PARTNERSHIP,

*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

---

**OPENING BRIEF FOR PETITIONER
MIDLAND COGENERATION VENTURE LIMITED PARTNERSHIP**

---

GORDON A. COFFEE
RAYMOND B. WUSLICH
STEFFEN N. JOHNSON
ERICA E. STAUFFER
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, D.C. 20006*
*Tel: (202) 282-5000*
*Email: gcoffee@winston.com*

*Attorneys for Petitioner*
*Midland Cogeneration Venture Limited*
*Partnership*

JULY 10, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Petitioner, an intervenor or respondent in the dockets before the Federal Energy Regulatory Commission, is Midland Cogeneration Venture Limited Partnership ("Midland" or "MCV").  Since July 2013, Midland has been indirectly owned by BPC Power Generation Corporation, Green Bridge Sparta Partners L.P., and Babaski Gate LLC.  These companies own and control Midland through a series of intermediary companies.[1]

Respondent is the Federal Energy Regulatory Commission ("FERC"). Intervenors in this appeal are Michigan Electric Transmission Company ("METC"), a utility owned by International Transmission Co., and Consumers Energy Company ("Consumers").

### B.     Orders Under Review

Midland is seeking review of the following FERC orders:

1.     Order Denying Rehearing and Granting Clarification, *Midwest Independent Transmission System Operator, Inc., Consumers Energy Co.*, and *Michigan Electric Transmission Co.*, 146 FERC ¶61,008, Docket Nos. ER10-

---

[1]   The intermediary entities are:  MCV GP Acquisition Company LLC; Chippewa Acquisition Company LLC; MCV Holding Company LLC; Progress Place Acquisition Company Inc.; and Sparta Acquisition Corporation.   BPC Power Generation Corporation is a subsidiary of OMERS Administration Corporation, a Canadian statutory corporation, and is the administrator of one of Canada's leading pension funds.

1814-002, ER10-2156-003, and EL11-2-001 (January 8, 2014);

2.    Order Granting in Part and Denying in Part Petition for Declaratory Order, *Michigan Electric Transmission Co.*, 138 FERC ¶61,202, Docket No. EL11-2-000 (March 20, 2012);

3.    Order on Rehearing, *Michigan Electric Transmission Co.*, 138 FERC ¶61,203, Docket No. ER11-136-001 (March 20, 2012);

4.    Order on Rehearing, *Midwest Independent Transmission System Operator, Inc., and Consumers Energy Co.*, 138 FERC ¶61,204, Docket Nos. ER10-1814-001, ER10-2156-001, and ER10-2156-002 (March 20, 2012); and

5.    Order, *Michigan Electric Transmission Co.*, 133 FERC ¶61,238, Docket No. ER11-136-000 (December 17, 2010).

## C.    Related Cases

The petitions for review of the above orders were consolidated by agreement of the parties and order of the Court.  Pending before the District Court for the Eastern District of Michigan, No. 1:10-cv-10661-TLL-CEB, is a lawsuit originally commenced by METC against Midland in Michigan state court in 2010 and removed by Midland to the district court.  In a May 23, 2011 order, reaffirmed in a September 19, 2012 order, the district court stayed the proceedings before it pending the outcome of the FERC proceedings and any appeals.  The district court lacks the power under 16 U.S.C. §825*l* to review the above FERC orders.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

    A.    Parties and Amici ................................................................. i

    B.    Orders Under Review ........................................................... i

    C.    Related Cases ..................................................................... ii

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ........................................................................................ ix

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION .................................................... 4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................... 9

APPLICABLE STATUTES AND REGULATIONS ............................. 9

STATEMENT OF THE CASE ............................................................. 10

I.    Factual Background ................................................................. 10

    A.    Execution of the Facilities Agreement ................................. 10

    B.    Spin-off of METC .............................................................. 11

    C.    Litigation over METC's Claims .......................................... 14

        1.    Litigation in Michigan courts.................................... 14

        2.    FERC proceedings ................................................... 15

            a.  Submission of a new generator interconnection agreement (Docket No. ER10-1814) ................................... 15

            b.  Submission of the Facilities Agreement .............................. 17

            c.  METC's motion for clarification of the Facilities Agreement Order ................................................................ 19

      d. METC's petition for a declaratory order and filing
of the Agency Agreement (Docket No. EL11-2
and Docket No. ER11-136) ................................................21

      e. March 20, 2012 orders ........................................................23

      f. January 8, 2014 Omnibus Rehearing Order ......................27

II.     Proceedings in this Court ....................................................28

SUMMARY OF ARGUMENT ..................................................................29

STANDING ................................................................................................32

ARGUMENT ..............................................................................................32

I.     FERC erred in finding that the Facilities Agreement and Agency
Agreement were enforceable prior to their effective dates. ..........33

    A. Rates cannot be charged before their effective date. ..........33

      1. FERC did not waive the notice requirement............................34

      2. Rates cannot be charged before they are effective. .................36

    B. FERC's position is contrary to other orders and the position
it has taken before this Court................................................40

    C. FERC's concern that denying enforcement would be unjust was
misplaced................................................................................43

II.    FERC acted contrary to law in excusing the violation of Section 10
of the Facilities Agreement........................................................48

III.   FERC arbitrarily refused to address that the charges at issue are not
recoverable under prior FERC orders..........................................54

CONCLUSION ............................................................................................61

CERTIFICATE OF COMPLIANCE ........................................................62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alcoa, Inc. v. FERC*,
564 F.3d 1342 (D.C. Cir. 2009)................................................................ 5, 54

*AT&T Corp. v. JMC Telecom, LLC*,
470 F.3d 525 (3d Cir. 2006)......................................................................43

*Atlantic City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002)......................................................................37

*Bangor Hydro-Elec. Co. v. FERC*,
925 F.2d 465 (D.C. Cir. 1991)..................................................................53

*BP West Coast Prods. v. FERC*,
374 F.3d 1263 (D.C. Cir. 2004)........................................................ 29, 41-42

*Central Hudson Gas Elec. Corp.*,
60 FERC ¶61,106, *reh'g denied*, 61 FERC ¶61,089 (1992) ...............................38

*Consolidated Edison Co. of N.Y. v. FERC*,
958 F.2d 429 (D.C. Cir. 1992)..................................................................33

*Consumers Energy Co.*,
139 FERC ¶61,014 (2012) ......................................................................57

*Consumers Energy Co.*,
142 FERC ¶61,193 (2013) ......................................................................26, 57

*Consumers Energy Co.*,
96 FERC ¶61,132 (2001) ........................................................................46

*Detroit Edison Co.*,
78 FERC ¶61,149 (1997) ........................................................................60

Authorities upon which we chiefly rely are marked with asterisks

*Duke Elec. Transmission*,
  96 FERC ¶61,145 (2001) ...............................................................5, 57

*Duke Power Co.*,
  27 FERC ¶61,160 (1984) .............................................................35, 36

*El Paso Elec. Co.*,
  105 FERC ¶ 61,131 (2003) ...........................................................37, 41

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
  954 F.2d 485 (8th Cir. 1992) ..............................................................43

*Hart v. Comerica Bank*,
  957 F.Supp. 958 (E.D. Mich. 1997) ......................................50, 51, 52

*La. Pub. Serv. Comm'n v. FERC*,
  522 F.3d 378 (D.C. Cir. 2008) ..............................................................8

*Maislin Industries v. Primary Steel, Inc.*,
  497 U.S. 116 (1990)...............................................................30, 41, 43

*Meretta v. Peach*,
  491 N.W.2d 278 (Mich. Ct. App. 1992) ...............................................50

*Miss. Delta Energy v. Entergy Servs., Inc.*,
  119 FERC ¶61,269 (2007) .................................................................47

*Missouri Pub. Serv. Com'n v. FERC*,
  601 F.3d 581 (D.C. Cir. 2010) ......................................................32, 46

*New England Power Co.*,
  27 FERC ¶63,037 (1984), *rev'd on other grounds*,
  31 FERC ¶61,047 (1985)....................................................................50

*New York Indep. Transmission Sys. Operator, Inc.*,
  123 FERC ¶61,093 (2008).............................................................47, 38

*Niagara Mohawk Power Corp. v. FERC*,
  452 F.3d 822 (D.C. Cir. 2006).........................................................5, 55

*Panhandle Eastern Pipe Line Co. v. FERC*,
  890 F.2d 435 (D.C. Cir. 1989) ...........................................................32

*PPL Wallingford Energy v. FERC*,
   419 F.3d 1194 (D.C. Cir. 2005) .......................................................53

*Prior Notice Order*, 64 FERC ¶61,139 (1993) .............................. 37-39, 44

*Prior Notice and Filing Requirements Under Part II of the*
   *Federal Power Act*, 65 FERC ¶61,081 (1993) ...................................38

*PSEG Energy Resources & Trade v. FERC*,
   665 F.3d 203 (D.C. Cir. 2011) ...............................................33, 42, 53

*Pub. Serv. Co. of Colo.*,
   62 FERC ¶61,013 (1993) ...........................................................21, 46

*Pub. Serv. Comm'n v. Panda-Brandywine, L.P.*,
   825 A.2d 462 (Md. 2003) .................................................................54

*Pub. Utils. Comm'n v. FERC*,
   894 F.2d 1372 (D.C. Cir. 1990) ..................................................... 8-9

*Rebel Motor Freight, Inc. v. ICC*,
   971 F.2d 1288 (6th Cir. 1992) .........................................................43

*Republic Airline Inc. v. U.S. Dep't. of Transp.*,
   669 F.3d 296 (D.C. Cir. 2012) ........................................................45

*Sancom, Inc. v. Qwest Commc'ns. Corp.*,
   643 F. Supp. 2d 1117 (D.S.D. 2009) ...............................................44

*SFPP, L.P. v. FERC*,
   592 F.3d 189 (D.C. Cir. 2010) ........................................................42

*SFPP, L.P.*,
   122 FERC ¶61,126 (2008) ........................................................41, 42

*SFPP, L.P.*,
   118 FERC ¶63,033 (2007) ...............................................................42

*Southwestern Pub. Serv. Co.*,
   81 FERC ¶61,384 (1997) .................................................................60

*Standardization of Generator Interconnection
   Agreements and Procedures, Order No. 2003,
   FERC Stats. & Regs. ¶31,146 (2003) ........ 5, 15-16, 20-21, 31, 44-47, 55, 58, 61

State Mut. Life Assurance Co. of Am. v. Deer Creek Park,
   612 F.2d 259 (6th Cir. 1979) .............................................................. 53

Trans-Elect, Inc. et al.,
   98 FERC ¶61,142 (2002) ................................................................... 44

Transmission Agency of Northern California v. FERC,
   495 F.3d 663 (D.C. Cir. 2007) ................................................... 32, 42, 46

Universal Life Church, Inc. v. Comm'r of Lottery,
   292 N.W.2d 169 (Mich. Ct. App. 1980) ............................................ 49

Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,
   475 F.3d 319 (D.C. Cir. 2006) ................................................... 32, 42, 46

Wisconsin Public Power, Inc. v. FERC,
   493 F.3d 239 (D.C. Cir. 2007) ............................................................. 8

Wolverine World Wide, Inc. v. Wolverine Canada, Inc.,
   653 F. Supp. 2d 747 (W.D. Mich. 2009) ............................................ 49

*Xcel Energy Servs., Inc. v. FERC,
   510 F.3d 314 (D.C. Cir. 2007) ....................................... 34, 38-40, 42

STATUTES

*Federal Power Act Section 205, 16 U.S.C. §824d ..................... 4, 33-34, 36-37, 39

Federal Power Act Section 206, 16 U.S.C. §824e ................................................ 24

Federal Power Act Section 313(b), 16 U.S.C. §825l ................................. 4, 8, 57

OTHER AUTHORITIES

3 Am. Jur. 2d Agency § 95 ............................................................................. 53

18 C.F.R. §35.3 ............................................................................................. 33

18 C.F.R. §35.11 ........................................................................................... 34

# GLOSSARY

| | |
|---|---|
| Agency Agreement | April 1, 2001 agreement between Consumers and METC under which Consumers delegated its duties and rights under the Facilities Agreement to METC |
| Agency Agreement Order | December 17, 2010 order in which FERC accepted the Agency Agreement for filing |
| Agency Agreement Rehearing Order | March 20, 2012 order in which FERC denied rehearing of its earlier Agency Agreement Order |
| Consumers | Consumers Energy Company |
| Declaratory Petition Order | March 20, 2012 order in which FERC granted in part METC's October 18, 2010 petition for a declaration that Midland had to pay amounts claimed by METC under the Facilities Agreement |
| Facilities Agreement | 1988 agreement between Midland and Consumers governing interconnection of Midland's generating plant to the electric grid |
| Facilities Agreement Order | September 17, 2010 order in which FERC accepted the Facilities Agreement for filing effective prospectively and accepted a new Generation Interconnection Agreement among Midland, METC, and the Midwest Independent Transmission System Operator, Inc. to replace the Facilities Agreement |
| Facilities Agreement Clarification Order | March 20, 2012 order in which FERC granted METC's motion for clarification and held that the Facilities Agreement was enforceable prior to its effective date |
| FERC | Federal Energy Regulatory Commission |

| | |
|---|---|
| Filed rate doctrine | Judicial doctrine that a regulated utility or carrier may not charge rates that are not on file with its federal regulator |
| METC | Michigan Electric Transmission Company, also referred to as Michigan Electric in FERC orders |
| Midland or MCV | Midland Cogeneration Venture Limited Partnership |
| Omnibus Rehearing Order | January 8, 2014 order in which FERC denied rehearing of two of its March 20, 2012 orders (the Facilities Agreement Clarification Order and Declaratory Petition Order) |
| Order No. 2003 | Order issued by FERC in 2003 which created a standard Generation Interconnection Agreement |
| Power Purchase Agreement | 1986 agreement between Consumers and Midland under which Consumers agreed to buy much of the output of the cogeneration plant |
| Time value refund | FERC remedy for late-filed agreements, in which the utility pays interest on amounts it received from the customer during the time the agreement was not filed |

## INTRODUCTION

This case involves a challenge to FERC orders compelling Midland, the owner of an electric generation plant, to pay amounts allegedly owing under two unenforceable contracts.   The contracts are (1) a 1988 Facilities Agreement between Midland and Consumers, a utility, governing the connection of Midland's plant to Consumers' electric transmission lines, and (2) a 2001 Agency Agreement under which Consumers delegated its rights and duties under the Facilities Agreement to METC, a subsidiary that Consumers spun off in 2000 and later sold.

Under the Federal Power Act, rates may not "go into effect" or "take effect" without prior notice to FERC and the public and FERC approval of the rates as "just and reasonable."   From 1988 until 2010, Consumers did not seek FERC approval of the Facilities Agreement.   Similarly, METC and Consumers did not seek FERC approval of the Agency Agreement from 2001 until 2010.   In both cases, FERC determined that the agreements were subject to FERC jurisdiction and thus should have been submitted to FERC upon execution.   When FERC ultimately approved the Facilities Agreement and Agency Agreement in 2010, it declared they would only be effective prospectively and rejected requests for a retroactive effective date for the Facilities Agreement.

FERC later held, however, that the 2010 effective dates were irrelevant to METC's right to charge Midland for services rendered before those dates.

According to FERC, "Midland has confused the effective date for Commission acceptance of a rate filing with the enforceable date of a jurisdictional agreement." R64, P19.  FERC thus held that the Facilities Agreement and Agency Agreement were enforceable from their inception, and that Midland had to pay the amount demanded by METC under those agreements.  However, the distinction that FERC drew between the effective date and the enforceability of an agreement has no basis in law.  Under the Federal Power Act and the filed rate doctrine, utility rates cannot be charged before the date that FERC chooses as the effective date.

FERC also erred in holding that Midland had a contractual duty to pay METC's claims.  METC came on the scene in 2000, when Consumers divested its electric transmission lines and associated equipment and METC became the new owner of those assets.  Because METC would be handling the interconnection of Midland's generation plant to the electric grid, Consumers sought Midland's consent to assign the Facilities Agreement to METC.  The rub, however, was the Facilities Agreement's provision that "[n]o assignment of this Agreement shall be valid unless the Power Purchase Agreement is also assigned in the same manner at the same time."  R4, Att. A at 29.

By its own admission, Consumers was unwilling to assign the Power Purchase Agreement.  It therefore decided to appoint METC as its "agent" under the Agency Agreement.  In the decision under review, however, FERC summarily

2

dismissed Midland's showing that the Agency Agreement—to which Midland never consented—was really an assignment by another name.  Moreover, METC could not be viewed as an agent under the governing Michigan law—which FERC never analyzed—since Consumers exercised almost no control over METC's activities and METC was operating and maintaining its *own* property, rather than property entrusted to it by Consumers.

Aside from granting METC rights under unenforceable agreements, FERC also erred in reimbursing METC for expenses—property taxes and operating and maintenance charges—that multiple FERC orders had declared non-reimbursable. FERC refused to consider this point, stating that Midland should have raised it sooner—in a rehearing petition challenging the September 2010 order in which FERC accepted the Facilities Agreement for filing.  But FERC would not have had jurisdiction over any such rehearing request, as the order did not aggrieve Midland. Indeed, FERC had ruled in Midland's favor by (1) refusing METC's request to give the Facilities Agreement a retroactive effective date, (2) declining to order Midland to pay METC, and (3) ordering METC to submit the Agency Agreement for approval.  Thus, there was nothing for Midland to challenge on rehearing.

Midland promptly raised the defense that METC's expenses were not reimbursable in response to METC's motion for clarification asking that the Facilities Agreement be declared enforceable prior to its effective date.  Midland

also lodged the same defenses in contesting METC's separate petition for an order from FERC directing Midland to pay METC, and in protesting METC's request for approval of the Agency Agreement. Thus, FERC had no legitimate reason to avoid ruling on whether its precedent barred METC from being reimbursed for property taxes and operating and maintenance expenses.

Accordingly, the petitions for review should be granted and FERC's orders reversed.

## STATEMENT OF JURISDICTION

FERC had jurisdiction over the proceedings before it in Docket Nos. ER10-184, ER10-2156, ER11-136, and EL11-2 under 16 U.S.C. §824d. This Court has jurisdiction to review FERC's orders under 16 U.S.C. §825*l*(b). Midland timely sought rehearing of the Agency Agreement Order, Declaratory Petition Order, and Facilities Agreement Clarification Order, as required by 16 U.S.C. §825*l*(b). Thus, this Court can address FERC's holding that the Facilities Agreement and Agency Agreement were enforceable before their effective dates, FERC's rejection of Midland's defense that the Agency Agreement was an invalid assignment under the Facilities Agreement, and FERC's order that Midland was obligated to pay the amounts sought by METC.

Midland also raised other defenses that FERC refused to consider, including that: (1) the Facilities Agreement and Agency Agreement allowed the collection of

4

property taxes and operation and maintenance expenses, in violation of FERC's Order No. 2003 and other FERC orders regarding transmission network upgrades, and (2) METC may be double-recovering. *See* R31 at 12-16. According to FERC, it did not have to address these defenses because Midland was making an impermissible collateral attack on the earlier Facilities Agreement Order for which Midland should have sought rehearing. R47, P18.

Midland was not required, however, to seek rehearing of the Facilities Agreement Order because it was not aggrieved by it. *See Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1346 (D.C. Cir. 2009) (agreeing with Alcoa that it was not "imminently aggrieved" by prior order and that Alcoa's request for rehearing of a later order was timely and not a collateral attack on prior order). In fact, FERC would have lacked jurisdiction over a rehearing petition by Midland. *Duke Elec. Transmission*, 96 FERC ¶61,145, 61,627 (2001) (denying a request for rehearing because the petitioner was not aggrieved by the order).

In addition, this Court has held that even if a party can establish that it was aggrieved by an order, "it need not seek review if it is satisfied with the practical impact of the order; and that does not foreclose its ability to challenge the principle as beyond the agency's statutory authority when the agency later utilizes it to cause substantial injury." *Niagara Mohawk Power Corp. v. FERC*, 452 F.3d 822, 827 (D.C. Cir. 2006). In this case, Midland did not need to worry about acceptance of

the Facilities Agreement Order because:  (1) the acceptance was prospective only; (2) the Facilities Agreement would soon be superseded in whole or part by a new generator interconnection agreement, under which METC would not be allowed to recover property taxes or operation and maintenance expenses; and (3) FERC agreed that METC was required to seek approval of the Agency Agreement, which Midland had announced it would protest.  *See* R21, PP1, 27; R13 at 13 n.42. Moreover, in the same Order, FERC *denied* METC's request for (1) a retroactive effective date for the Facilities Agreement, and (2) an order directing Midland to pay the amounts claimed by METC.  *See* R21 PP2, 23; R19 at 3, 9.

In short, the Facilities Agreement Order granted METC none of the relief it had sought and ruled in Midland's favor.  Not surprisingly, METC viewed *itself* as aggrieved by the Facilities Agreement Order and filed a motion seeking clarification or rehearing.  R26.  Midland timely filed an opposition to METC's motion, which FERC refused to consider.  R31; R48, P23.  And when FERC issued an order giving METC the requested clarification (the Facilities Agreement Clarification Order), Midland timely sought rehearing.  R48; R50.

Midland also timely protested METC's petition for a declaratory order, which sought the same relief that FERC had earlier refused to provide in the Facilities Agreement Order—an order directing Midland to pay the amounts

claimed by METC.  R33, R23 at 2.  Midland further timely protested METC's

filing of the Agency Agreement.  R33.

Midland's injury arose not from the Facilities Agreement Order but from

FERC's later orders, when FERC (1) granted METC's motion for clarification

(after refusing to consider Midland's opposition) and declared that the Facilities

Agreement was enforceable even prior to its effective date (R48, PP23, 26),

(2) accepted the Agency Agreement for filing (R41), (3) granted METC's petition

for a declaratory order (R46, PP20-23), and (4) stated that Midland had to

reimburse the expenses claimed by METC (R46, PP21-23).  FERC thus erred in

holding that by not seeking rehearing of the Facilities Agreement Order, Midland

waived its right to challenge whether property taxes and operating and

maintenance expenses were reimbursable under FERC precedent.  For the same

reasons, this Court has jurisdiction to review FERC's error on that score.

The ongoing proceeding at FERC does not deprive this Court of jurisdiction.

FERC has conclusively ruled that the Facilities Agreement and Agency Agreement

are enforceable against Midland during time periods when they were not effective,

and that Midland is obligated to pay the categories of expenses—property taxes

and operating and maintenance expenses—that METC alleges are owing.  *See* R64,

PP18-22.  The only item left for resolution is the exact amount that Midland owes

METC.  *See id.* P31.  FERC set that issue for hearing before an administrative law

judge, which is still pending and likely will not result in a reviewable order for several more years.  *See id.*

Under 16 U.S.C. §825*l*, "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order."  In *Wisconsin Public Power, Inc. v. FERC*, 493 F.3d 239, 265-66 (D.C. Cir. 2007), this Court rejected FERC's claim that it had not made a final decision because it was fine-tuning the calculation of refunds in later compliance filings.  As the Court explained, FERC had found the methodology for computing losses to be just and reasonable.  *Id.*  Likewise, FERC here has conclusively held that the expenses for which METC demands reimbursement are just and reasonable.  Even though the exact amount owed has not been determined, the legal consequences for Midland have been settled.

There is no question as to the finality of FERC's orders.  FERC has not made its orders contingent on subsequent events or left its orders open to revision at a later stage.  *See La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 398 (D.C. Cir. 2008) (rejecting FERC's argument that petitioners would not suffer a reviewable injury until a later compliance proceeding was concluded because FERC had conclusively resolved the refund and timing issues).  And as in *Pub. Utils. Comm'n v. FERC*, 894 F.2d 1372, 1377 (D.C. Cir. 1990), since FERC has rejected all of the

defenses raised by Midland, "there is no possibility that the remaining proceedings might moot the case by giving victory to the loser on other grounds."

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1) Whether FERC violated the Federal Power Act and the filed rate doctrine in holding that the Facilities Agreement and Agency Agreement were enforceable against Midland before the date that FERC declared them to be effective.

2) Whether FERC wrongly held that Midland was obligated to pay amounts claimed by METC when METC's rights derived from an Agency Agreement to which Midland never agreed and which was an invalid assignment under the terms of the Facilities Agreement.

3) Whether FERC wrongly refused to consider Midland's defense that it was not obligated to pay METC's costs when longstanding FERC orders stated that those costs could not be charged to Midland.

## APPLICABLE STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the attached addendum.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     Execution of the Facilities Agreement

Midland owns and operates a gas-fired cogeneration plant in Midland, Michigan.  R21, P3.  The plant generates both steam and electricity.  *Id.*  The steam serves a nearby Dow Chemical plant.  *Id.* P3 & n.6.  The electricity is primarily sold to Consumers, a Michigan utility, and Dow Chemical.  *Id.*

In 1986, Midland and Consumers executed an agreement governing the sale of electricity to Consumers once the plant was constructed (the "Power Purchase Agreement").  R4 Att. A at 1.  In 1988, as construction of the Midland plant neared completion, Consumers and Midland also executed another agreement—the Facilities Agreement—to address the interconnection of the Midland plant to Consumers' electric transmission lines and the Dow Chemical plant.  R48, P1 and P3.  Under the Facilities Agreement, Midland agreed to pay what turned out to be approximately $16 million for transformers, switches, meters, and other equipment.  R33, Exh. H at 2-3.  These costs included upgrading Consumers' transmission equipment.  R33 at 3.  Midland also committed to convey title to all of the equipment (termed "facilities") to Consumers.  R4, Att. A at 12.

The Facilities Agreement also obligated Midland to reimburse Consumers for all future direct and indirect expenses Consumers incurred in connection with the facilities, even though Consumers was the owner of the facilities.  *Id.* at 16-17,

10

20-21.  These expenses consisted primarily of local property taxes levied on transmission equipment such as transformers; the balance were operating and maintenance expenses.  Midland not only paid those taxes, it also paid $6.2 million after 2001 to upgrade, maintain, and replace various pieces of transmission equipment.  R33 Exh. A ¶¶14-16.

### B.    Spin-off of METC

In 2000, Consumers chose to reorganize its business and divest its electric transmission assets (meaning its higher voltage power lines and related equipment).  *See* R33 Exh. C.  Consumers established a subsidiary, METC, to which Consumers conveyed those assets.    R46, P5 & n.10.    METC took ownership, *id.*, and assumed all of Consumers' liabilities regarding those assets, R4 Att. C at 6-7.  Consumers retained ownership of its electric generation plants and localized lower voltage distribution lines, including the lines and switches needed to move electricity from the Midland plant to Dow Chemical.  *See* R33 Exh. C at 3.

Because METC would own, operate, and maintain the transmission lines and equipment that Consumers had acquired under the Facilities Agreement, Consumers sought to assign the Facilities Agreement to METC.  *See* R46, P5 & n.12.  In 2001, Consumers asked for Midland's consent, R33 at 4, as required under Section 10 of the Facilities Agreement, which provides that it "shall not be

11

transferred or otherwise alienated without the other Party's written consent," R4, Att. A at 29.

Midland responded by sending a letter asking whether Consumers also intended to assign the Power Purchase Agreement.[2] R33, Exh. A ¶6. Under Section 10 of the Facilities Agreement, the Facilities Agreement and Power Purchase Agreement had to be assigned in tandem: "No assignment of this Agreement shall be valid unless the Power Purchase Agreement is also assigned in the same manner at the same time." R4, Att. A at 29. Consumers never answered Midland's letter or question about Section 10. Instead, in April 2001, it entered into an Agency Agreement with METC. R33 at 4; R4, Att. C at 1.

The preamble to the Agency Agreement acknowledged Section 10's requirement that "[n]o assignment of [the Facilities Agreement] shall be valid unless the Power Purchase Agreement [] is also assigned in the same manner at the same time." R4, Att. C at 2. According to the preamble, however, "Consumers has no desire to transfer the Power Purchase Agreement to METC." *Id.* The Agency Agreement instead called for METC to act as Consumers' "agent" in carrying out Consumers' duties under the Facilities Agreement. *Id.* at 3-4.

---

[2]    Midland also requested that Consumers explain the impact of the proposed assignment on certain sale-leaseback agreements, including a Consumers Consent Agreement. R33, Exh. A ¶6. Midland further pointed to the need to secure approval from other owners of Midland, as required under Section 1(d) of a June 1, 1990 Consumers Consent and Agreement. *Id.*

Under Article II of the Agency Agreement, Consumers delegated to METC all of Consumers' duties and obligations under the Facilities Agreement except those regarding the connection to the Dow Chemical plant. *Id.* at 2-6. Article II identified the tasks that METC was assuming, almost all of which involved operating and maintaining property that METC, not Consumers, now owned and liability for which METC had assumed. *Id.* METC was "delegated the full scope of operating authority Consumers possesses" under the Facilities Agreement and had complete autonomy. *Id.* at 3. The only exceptions concerned submitting invoices and billing meters, where coordination with Consumers was required. *Id.*

Aside from those two limited areas, Consumers had no right to direct or control how METC carried out the duties it assumed under the Agency Agreement. METC also had no obligation to apprise Consumers of the actions METC was taking as Consumers' putative agent. METC's only reporting duty was to keep Consumers informed of the status of payments received from Midland. *Id.* at 4.

The only compensation that METC received from Consumers was $500 per month. *Id.* at 6 (Article III). METC was to receive the bulk of the compensation from Midland, in the form of reimbursement of the expenses that METC incurred in owning and operating the transmission equipment. *Id.*

Midland neither signed nor consented to the Agency Agreement. R46, P5. Indeed, Consumers did not notify Midland of the Agency Agreement until several

13

months after its execution, and it was not until 2004—three years later—that Consumers supplied Midland with a copy.  R33 at 4.

For several months after the Agency Agreement was executed, Consumers continued to bill Midland for property taxes and operation and maintenance expenses.  R33 at 4.  Midland paid those invoices.  *Id.*  In 2003 and 2004, after Consumers sold METC to a third party, TransElect, *see* R47 n.4, METC itself sent invoices directly to Midland, which Midland's accounting department mistakenly paid.  R33, Exh. A ¶¶9-10.  But in late 2004, when Midland's general counsel learned of these payments, Midland stopped them and demanded that METC return the money.  R33 Exh. A ¶¶9-12.  METC refused, and continued to bill Midland. *Id.* ¶13; R23 at 19.  Midland in turn refused to pay the new invoices.  R33 Exh. A ¶11.

### C.   Litigation over METC's Claims

#### 1.   Litigation in Michigan courts

In January 2010, METC sued Midland in Michigan state court alleging breach of contract.  R33, Exh. D at 1.  Midland removed the case to federal court and moved to dismiss on the grounds that (1) the Facilities Agreement and Agency Agreement, having never been filed with and approved by FERC, could not be enforced under the Federal Power Act and filed rated doctrine, and (2) METC had no standing to demand payment given its lack of a contract with Midland and the

14

violation of the anti-assignment provision in the Facilities Agreement.  *Id.* at 2; R33, Exh. B at 13.  METC moved to remand, claiming no federal jurisdiction, and opposed the motion to dismiss, arguing that FERC had actually approved the Facilities Agreement in 2003 in connection with Consumers' sale of METC to TransElect.  R33, Exh. B at 7 and Exh. D at 2.

In August 2010, the district court denied both the motion to remand and the motion to dismiss.  R33, Exh. D.  The court held that it was possible that FERC had approved the Facilities Agreement in the 2003 order, and requested briefing on whether it should defer to FERC under the primary jurisdiction doctrine.  *Id.* at 25-28.  In the meantime, however, proceedings had commenced at FERC.  Thus, both parties agreed that deferring to FERC was appropriate, and the district court stayed the case pending the outcome of the FERC proceedings.  Order Staying Proceedings, No. 10-10661 (E.D. Mich. Sept. 19, 2012).

### 2. FERC proceedings

#### a. Submission of a new generator interconnection agreement (Docket No. ER10-1814)

The first FERC action began in July 2010, when the Midwest Independent Transmission System Operator sought approval of a generator interconnection agreement among it, Midland, and METC (Docket No. ER10-1814).  R1, R2. Several years earlier, Midland had sent a letter to METC suggesting negotiation of a contract between the two companies.  R33, Exh. A ¶12.  Under Order No. 2003,

15

a FERC order issued in 2003, any agreement between Midland and METC regarding connection of the Midland plant to METC's transmission lines would have to adhere to a FERC-approved template, called the standard large generator interconnection agreement. *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶31,146 at P34 (2003). Under FERC's standard (*pro forma*) agreement, METC would not have the right to charge Midland for property taxes or operation and maintenance expenses on METC's transmission equipment. As FERC stated: "The Commission rejects the proposal that ad valorem property taxes be included in the Interconnection Customer's obligation to reimburse the Transmission Provider for taxes, since these expenses are annual and are more analogous to operating expenses that are not covered under the [large generator interconnection agreement]." *Id*. at P444.

For several years, Midland and METC could not agree on certain terms of a new generator interconnection agreement, which would allow Midland to expand its electric output. *See* R1 at 2-3. The main dispute was over METC's demand that Midland install new revenue meters at an estimated cost of over $2 million. R1 at 3, R8 at 10. Ultimately, Midland asked that the agreement be filed with FERC unexecuted. R1 at 2-3. The Midwest Independent Transmission System Operator, which oversees all transmission operations in Midwest states, did so, and

16

sought FERC's approval of the agreement and resolution of the disputed terms. R1.

Once the new generator interconnection agreement was filed, the parties contemplated that it would govern the interconnection of Midland's plant to METC's transmission lines and the compensation, if any, due METC. R1 at 2. A whereas clause in the agreement stated that Midland and METC "agree to have the Facilities Agreement terminated in its entirety or amended to terminate the interconnection service it currently provides, and agree that upon the termination or amendment of the Facilities Agreement this new Agreement will define the rights of each of them in regards to the interconnection facilities." R1, Tab A at 2.

### b.      Submission of the Facilities Agreement

The next FERC docket (ER10-2156) was opened in August 2010, when Consumers filed the Facilities Agreement. *See* R4 at 3. Consumers asked FERC to accept the Facilities Agreement with an effective date 60 days after filing. *Id.* at 1. Midland filed a response in which it advised FERC of the pending litigation between Midland and METC, R13 at 8, and asked that FERC require METC to file the Agency Agreement, which Midland explained that it intended to protest, *id.* at 13 & n.42. Although Midland questioned the need to file the Facilities Agreement, it did not formally protest the filing in light of Consumers' request for a later effective date and the likelihood that the Facilities Agreement would be superseded

17

in whole or part by the new generation interconnection agreement. *Id.* at 8, 12-13. Midland asked that, if the Facilities Agreement should be accepted for filing, it be accepted only to the extent that it did not conflict with the new generation interconnection agreement. *Id.* at 12.

In response, METC asked FERC to accept the Facilities Agreement "retroactive to the date it is found to have first become jurisdictional." R19 at 3. Although METC acknowledged that FERC "normally accepts late-filed agreements on a prospective basis," it argued that there were several reasons why "a retroactive effective date in this case would be appropriate and in the public interest." *Id.* METC also asked FERC to "order MCV to pay the contractually mandated charges for the interconnection services it received under the Facilities Agreement from 2005 to the present." *Id.* at 10. Midland opposed both requests.

On September 17, 2010, FERC issued the Facilities Agreement Order, reported as *Midwest Independent Transmission System Operator, Inc.*, 132 FERC ¶61,241 (2010). The Order accepted the new generator interconnection agreement, but on the condition that the Facilities Agreement be amended or cancelled. R21, P1. If Midland and Consumers chose to amend it, they would have to remove any language from the Facilities Agreement that pertained to interconnection service. *Id.* P35.

FERC also accepted the Facilities Agreement for filing, effective October 5, 2010, and thus denied METC's request for a retroactive effective date. *Id.* P2. FERC also rejected METC's request for an order directing Midland to pay the amounts claimed by METC. FERC further stated that Consumers' submission of the Facilities Agreement did not relieve METC of its responsibility to file the Agency Agreement. *Id.* P27.

The Facilities Agreement Order also directed Consumers to issue a refund based on the time value of the monies it had received from Midland before October 5, 2010. *Id.* P26. FERC agreed with Midland that the Facilities Agreement became subject to FERC's jurisdiction upon execution in 1988, since the Power Purchase Agreement gave Midland the right to make third-party sales. *Id.*[3]

### c.     METC's motion for clarification of the Facilities Agreement Order

In October 2010, METC moved for clarification of the Facilities Agreement Order.[4] R26. METC's motion asked FERC to "clarify that the non-filing of the Facilities Agreement and the Agency Agreement did not affect the validity and enforceability of those agreements during the period of non-filing." R26 at 3. In

---

[3]  FERC noted that if Midland had contractually committed to sell all of its power to Consumers, then the Facilities Agreement would not be subject to FERC's jurisdiction. *See id.* PP24-26.

[4]  Consumers filed a separate rehearing motion, attacking FERC's holding that the Facilities Agreement was subject to FERC's jurisdiction prior to 2006. R27. Consumers did not challenge the October 5, 2010 effective date for the filing.

the alternative, METC sought rehearing, asking that, "[i]n the event that the Commission finds that the September 17 order was intended to establish that the Facilities Agreement and/or the Agency Agreement were not valid or enforceable prior to the effective date of their acceptance for filing, and/or that the order was intended to modify the Commission's policies with respect to late-filed agreements, the Commission should grant rehearing and modify the order to be consistent with longstanding Commission and court precedent." *Id.* METC did *not* take the position that FERC's acceptance of the Facilities Agreement barred Midland from questioning the justness and reasonableness of METC's charges. To the contrary, METC said it "must emphasize in this regard that it is not here requesting that the Commission investigate or rule upon whatever other arguments or claims [Midland] may advance in defense of its non-payment." *Id.* at 7.

Notably, METC did not seek rehearing of FERC's setting of an October 5, 2010 effective date for the Facilities Agreement.

Midland opposed the motion for clarification, noting, among other things, that because "[c]harges in jurisdictional contracts are not legal rates unless filed with the Commission," R31 at 5, FERC could not enforce any charges in the Facilities Agreement and Agency Agreement retroactively without violating the filed rate doctrine, *id.* at 11-12. Midland also pointed out that Order No. 2003 expressly rejected "the proposal that ad valorem property taxes [the type of taxes

for which METC sought reimbursement] be included in the Interconnection Customer's obligation to reimburse the Transmission Provider," *id.* at 14 (quoting Order No. 2003), and that METC was attempting to make Midland pay charges for network upgrades "in contravention of established Commission policy prohibiting direct assignment of the costs of such facilities," *id.* at 12-13 (citing *Pub. Serv. Co. of Colo.*, 62 FERC ¶61,013, at 61,061 (1993)). Midland also questioned whether METC already was recovering the charges from its transmission customers, meaning it was "seeking a double recovery, in violation of FERC policy." *Id.* at 16 (citing *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, FERC Stats. & Regs. ¶31,241 at P690 (2007)).

### d. METC's petition for a declaratory order and filing of the Agency Agreement (Docket No. EL11-2 and Docket No. ER11-136)

Rather than await FERC's ruling, METC chose to open a third front. On the same day that METC moved for clarification of the Facilities Agreement Order, it filed a new petition for a declaratory order (Docket No. EL11-2). R23. In that petition, METC sought the relief that FERC had declined to give in the Facilities Agreement Order—a "specific determination that Midland must reimburse these taxes and other O&M costs to METC as METC has provided services under the Agency Agreement and the Facilities Agreement." *Id.* at 2. In the same submission, to which FERC assigned a separate docket number (ER11-136) (R28),

21

METC asked FERC to accept the Agency Agreement. *Id.* at 3. METC did not ask for a waiver of the Federal Power Act's requirement that rates cannot take effect without advance notice. Instead, it requested a finding "that the METC's late filing of the Agency Agreement does not render the service provided under it null and void." *Id.* at 26.

Midland timely protested both the petition for a declaratory order and the filing of the Agency Agreement. R33. Midland raised the same defenses it had raised in its opposition to METC's motion for clarification. R33 at 2; R31 at 5-7. Midland also asked FERC to order METC to refund approximately $6.2 million that Midland was forced to pay to replace, maintain, and upgrade METC's transmission assets in earlier years. R33 at 8.

On December 17, 2010, FERC accepted the late-filed Agency Agreement, effective on that date (the "Agency Agreement Order"). *Michigan Electric Transmission Co.*, 133 FERC ¶61,238 at P8 (2010) (R41). The Agency Agreement Order stated that, because Midland did not seek rehearing of the Facilities Agreement Order, Midland's "challenge in the instant proceeding to rates under the Facilities Agreement represents an impermissible collateral attack on the rates that the Commission has already approved" in the Facilities Agreement Order. *Id.* P9. FERC added, however, that its "acceptance of the Agency Agreement is not a determination that Michigan Electric has rights, enforceable against Midland, to

collect and retain payments that Midland is obligated to make under the Facilities Agreement.   That question is properly part of the Docket No. EL11-2-000 proceedings."   *Id.* n.11.   Midland timely sought rehearing of the Agency Agreement Order.  R42.

### e.     March 20, 2012 orders

On March 20, 2012, FERC issued three interrelated orders addressing METC's petition for a declaratory order, Midland's request for rehearing of the Agency Agreement order, and METC's motion for clarification of the Facilities Agreement Order.   *Michigan Electric Transmission Co.*, 138 FERC ¶61,202 (2012) ("Declaratory Petition Order") (R46); *Michigan Electric Transmission Co.*, 138 FERC ¶61,203 (2012) ("Agency Agreement Rehearing Order") (R47); and *Midwest Independent Transmission System Operator, Inc., and Consumers Energy Co.*, 138 FERC ¶61,204 (2012) ("Facilities Agreement Clarification Order") (R48).

In the Declaratory Petition Order, FERC granted in part and denied in part METC's petition for a declaratory order.  FERC held that Midland was obligated to pay the expenses for which METC sought reimbursement.  *Id.* PP21-25.  FERC declined, however, to order Midland to pay METC directly, noting that "it [was] unclear what the contractual basis would be for any such order" since "Midland and [METC] are not both parties to any agreement."  *Id.* P21.  FERC instead treated the amounts claimed by METC under the Facilities Agreement and Agency

Agreement as owed to Consumers. *Id*. P20. FERC thus declared that Midland was "obligated to reimburse Consumers Energy for the costs (including property taxes) properly incurred under the Facilities Agreement to provide the O&M services." *Id*.

FERC denied that requiring Midland to pay amounts incurred before FERC accepted the Facilities Agreement and Agency Agreement would violate the Federal Power Act and the filed rate doctrine. *Id*. P22. FERC claimed that its precedent allowed "late-filed agreements to be effective from the time they were jurisdictional (with a time-value remedy for the late filing)." *Id*. FERC also rejected Midland's contention that METC and Consumers were violating the anti-assignment clause of the Facilities Agreement. According to FERC, "Midland has not filed any complaint against Consumers Energy based on the alleged contract violation." *Id*. P23.

FERC similarly rejected Midland's invocation of Order No. 2003, based on Midland's alleged "failure to seek rehearing of the Facilities Agreement Order." *Id*. P24. FERC also held that, if Midland wished to challenge any potential double-recovery by METC of transmission charges, it would have to file a complaint under Section 206 of the Federal Power Act, 16 U.S.C. §824e(a). *Id*. P25. FERC did not mention that it can only grant *prospective* relief under Section 206—

24

meaning that even a successful complaint would not affect the past charges for which METC was demanding reimbursement.

In the Agency Agreement Rehearing Order, FERC denied Midland's request for clarification or, in the alternative, rehearing of the Agency Agreement Order. R47, P1. According to FERC, by challenging the justness and reasonableness of the rates that METC was seeking to charge, Midland was making an "impermissible collateral attack" on FERC's acceptance of the Facilities Agreement. *Id.* P18. FERC denied that the Agency Agreement incorporated by reference charges set forth in the Facilities Agreement, in violation of FERC precedent. *Id.* P16. FERC also rejected the notion that the charges that METC was seeking to collect under the Agency Agreement differed from the charges Consumers was authorized to collect under the Facilities Agreement. *Id.* P11. According to FERC, the "Agency Agreement does not purport to be anything other than what its name suggests—an agreement by which Consumers Energy has engaged Michigan Electric, as its agent, to perform certain of the operations and maintenance duties that would otherwise be performed by Consumers Energy under the Facilities Agreement." *Id.*

In the Facilities Agreement Clarification Order, FERC declined to consider Midland's opposition to METC's motion for clarification, characterizing the opposition as an answer to a request for rehearing. R48, P23. The Commission

25

then proceeded to grant METC's motion. *Id.* P26.  FERC agreed with METC that "the acceptance of the late-filed Facilities Agreement, with an effective date of October 5, 2010, and the late-filed Agency Agreement, with an effective date of December 17, 2010, does not affect the validity and enforceability of those agreements during the period of non-filing." *Id.*  According to FERC, giving no effect to the late-filed agreement before the stated effective date of FERC's order "could be unjust." *Id.* P27.  FERC instead touted its "time value refund" policy, which allows utilities to keep any payments received from customers under unfiled agreements but makes the utilities pay interest on those payments. *Id.* PP27-28. FERC claimed that this policy "encourages compliance with the prior notice and filing requirements while still ensuring that a utility may collect bargained-for rates prior to the filing of those rates." *Id.* P27.

FERC further directed Midland to pay the charges referenced in the Facilities Agreement. *Id.* P30.  Because those charges were not liquidated, FERC ordered Consumers to file a revised refund report itemizing them. *Id.* P32.  In April 2012, Consumers filed the revised refund report in Docket No. ER10-2156-002.  In May 2012, Midland protested that report.  In a March 2013 order, FERC set the matter for hearing before an administrative law judge. *Consumers Energy Co.*, 142 FERC ¶61,193 at P2 (2013).

**f.      January 8, 2014 Omnibus Rehearing Order**

In April 2012, Midland timely submitted both a petition for rehearing and clarification of the Facilities Agreement Clarification Order, and a petition for rehearing of the Declaratory Petition Order.  R49, R50.  On January 8, 2014, FERC issued a single order denying both rehearing petitions.  *Midwest Independent Transmission System Operator, Inc.*, 146 FERC ¶61,008 (2014) (the "Omnibus Rehearing Order") (R64).  In denying that enforcing the Facilities Agreement and Agency Agreement violated the filed rate doctrine, FERC asserted that "Midland has confused the effective date for Commission acceptance of a rate filing with the enforceable date of a jurisdictional agreement."  *Id*. P19.  FERC also reiterated that giving no effect to late-filed agreements prior to the Commission-established effective date "could be unjust."  *Id*. P22.

FERC also denied that in its earlier order, it had made an implicit finding that Midland had waived the protections of Section 10 of the Facilities Agreement because it did not sue Consumers for breach of contract.  *Id*. PP27-28.  According to FERC, it "merely determined that, under the Facilities Agreement, Midland was entitled to service from Consumers Energy, and Midland indeed received service from Consumers Energy."  *Id*. P28.  FERC also asserted that "the Facilities Agreement appears to expressly contemplate that Consumers Energy may engage agents to assist in performing its obligations."  *Id.*

FERC did not explain how Consumers could engage agents to operate and maintain transmission facilities that it no longer owned or controlled. FERC also did not address Midland's point that, under Michigan law, an agent has no authority to pursue litigation on behalf of its principal.

## II.     Proceedings in this Court

In May 2012, Midland timely petitioned for review of the Agency Agreement Order and Agency Agreement Rehearing Order. As a precaution, Midland also petitioned for review of the Facilities Agreement Clarification Order, but moved to hold that petition in abeyance pending the outcome of the petitions for rehearing of the Declaratory Petition Order and the Facilities Agreement Clarification Order. METC moved to dismiss the petition.

In August 2012, the Court granted and denied both motions in part. It held that Midland could not simultaneously seek both rehearing and judicial review of the Facilities Agreement Clarification Order, and thus that Midland's petition for review was premature. It further held that FERC had adequate notice that Midland was challenging both the Agency Agreement Order and Agency Agreement Rehearing Order, and thus denied METC's motion to dismiss the petition for review of the former. The Court also granted Midland's motion to hold the petitions for review of those orders in abeyance.

28

On February 7, 2014, Midland timely petitioned for review of the Omnibus Rehearing Order and moved to consolidate the two petitions and lift the abeyance in No. 12-1224. METC agreed to consolidation but opposed the motion to lift the abeyance. METC further cross-moved to hold No. 14-1020 in abeyance. FERC supported METC's cross-motion.

On April 23, 2014, the Court granted the motion to consolidate the petitions for review and Midland's motion to lift the abeyance in No. 12-1224. The Court also directed the parties to brief the Court's jurisdiction to hear the petition for review in No. 14-1020.

## SUMMARY OF ARGUMENT

FERC's holding that METC could charge rates under the Facilities Agreement and Agency Agreement before FERC declared the agreements to be effective was contrary to law. The Federal Power Act repeatedly states that rates shall not "go into effect" or "take effect" without prior notice to FERC and the public, and without FERC finding the rates to be just and reasonable. The import is clear—rates cannot be charged without prior notice to, and approval of, FERC, even with respect to negotiated bilateral contracts. As this Court has previously held, FERC "may not regulate rates as if they existed in a world that never was. It must take the rates as it finds them, and here, FERC found them unfiled." *BP West Coast Prods. v. FERC*, 374 F.3d 1263, 1274 (D.C. Cir. 2004).

29

Although the Federal Power Act gives FERC the power to waive the notice requirement upon a showing of "good cause," FERC did not waive the requirement here. Consequently, FERC lacks the power to hold that the Facilities Agreement and Agency Agreement are "enforceable," and that the rates charged under those agreements are "collectible," solely because FERC views a different result as unjust. As the Supreme Court explained in *Maislin Industries v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990), the filed rate doctrine "is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress." In short, "adherence to unfiled rates[] undermines the basic structure of the Act." *Id.* at 132.

In any event, denying enforcement of the Facilities Agreement and Agency Agreement would not work either an injustice or a hardship. METC had no valid claim against Midland because the assignment of Consumers' rights and duties to METC via the Agency Agreement was invalid under the Facilities Agreement. Nor could METC be viewed as a true "agent" under the governing Michigan law, as Consumers exercised no control over METC's activities and METC owned and operated the transmission lines and equipment used to connect Midland to the electric grid. In short, FERC acted contrary to law in allowing Consumers to circumvent the Facilities Agreement.

30

METC also has no right to reimbursement for property taxes and operating and maintenance expenses under binding FERC precedent. Order No. 2003 expressly forbids utilities such as METC from charging customers for property taxes assessed on transmission facilities. Other FERC orders prohibit utilities from charging generation plants with the costs of upgrading and maintaining transmission facilities used to serve all of the utilities' customers.

The fact that Midland did not seek rehearing of the Facilities Agreement Order does not justify FERC's refusal to address Midland's defenses and counterclaim. Midland had no reason to seek rehearing. In fact, Midland was barred from doing so because it was not aggrieved by the Order. FERC had rejected METC's requests for (1) a retroactive effective date for the Facilities Agreement and (2) an order directing Midland to pay METC. Moreover, FERC had ordered METC to file the Agency Agreement for a determination of whether its rates were just and reasonable. Thus, there was nothing for Midland to appeal. And once that becomes clear, it also becomes clear that the FERC orders at issue must be reversed.

## STANDING

In the orders under review, FERC held that the Facilities Agreement and Agency Agreement were enforceable against Midland and declared that Midland must pay METC's charges. Because Midland is directly aggrieved by such orders, it has standing to challenge them.

## ARGUMENT

This Court reviews FERC orders under the standard set forth in the Administrative Procedure Act, which provides that "agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' cannot survive judicial review." *Missouri Pub. Serv. Com'n v. FERC*, 601 F.3d 581, 585 (D.C. Cir. 2010) (quoting 5 U.S.C. §706(2)(A)). "Under this standard, FERC must engage in reasoned decisionmaking, taking a hard look at the salient problems before it and offering reasoned explanation for any divergence from agency precedent." *Panhandle Eastern Pipe Line Co. v. FERC*, 890 F.2d 435, 439-40 (D.C. Cir. 1989) (citations and quotations omitted). In addition, "where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Transmission Agency of Northern California v. FERC*, 495 F.3d 663, 671 (D.C. Cir. 2007) (citation omitted); *see also Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) ("Reasoned decisionmaking necessarily

32

requires consideration of relevant precedent."). Further, "failure to respond meaningfully to objections raised by a party renders [the agency's] decision arbitrary and capricious." *PSEG Energy Resources & Trade v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (citations and quotations omitted).

## I.     FERC erred in finding that the Facilities Agreement and Agency Agreement were enforceable prior to their effective dates.

### A.     Rates cannot be charged before their effective date.

FERC's finding that the Facilities Agreement and Agency Agreement were enforceable before their effective dates directly violates the filed rate doctrine, which "generally prohibits a regulated entity from charging rates 'other than those properly filed with the appropriate federal regulatory authority.'" *Consolidated Edison Co. of N.Y. v. FERC*, 958 F.2d 429, 432 (D.C. Cir. 1992) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). In the context of electric power, Section 205 of the Federal Power Act requires utilities subject to FERC's jurisdiction to file their rates with FERC. 16 U.S.C. § 824d(d). Under the statute, no rate or rate change may "go into effect" except after 60 days' notice to FERC and the public. *Id.*; *accord* 18 C.F.R. §35.3.

The purpose of the filing requirement is not just to give notice to customers of the rates they will be charged. As this Court has explained, "the filing and prior notice requirements of section 205 … and FERC regulations, 18 C.F.R. §35.3, provide FERC with timely information from which it can 'monitor the

reasonableness of prices and undue discrimination in the marketplace' and 'assist the public in filing complaints' by providing it with 'good information about energy transactions.'"  *Xcel Energy Servs., Inc. v. FERC,* 510 F.3d 314, 317 (D.C. Cir. 2007) (quoting *Revised Public Utility Filing Requirements*, 99 FERC ¶61,107 at P46 (2002)).  There was no basis for departing from the requirement here.

### 1.    FERC did not waive the notice requirement.

FERC has the power to waive the notice requirement and allow the change to "take effect" at an earlier date, but only "for good cause shown."  *Xcel,* 510 F.3d at 315; 16 U.S.C. §824d(d).  In that event, FERC must specify when the charge "shall take effect."   16 U.S.C. §824d(d).   Under FERC's regulations, "[u]pon application and for good cause shown," FERC "may, by order, provide that a rate schedule, tariff, or service agreement, or part thereof, shall be effective as of a date prior to the date of filing."  18 C.F.R. §35.11.

In this case, however, no waiver was sought—let alone given—for either the Facilities Agreement or the Agency Agreement.  When Consumers filed the Facilities Agreement in August 2010, it evidently recognized that it could not show good cause for the late filing.  Thus, Consumers did not seek a waiver of the effective date but instead requested that the Facilities Agreement "be allowed to become effective 60 days after the date of filing."  *See* R4 at 1.

METC reacted by requesting that FERC declare the Facilities Agreement "retroactive to the date it is found to have first become jurisdictional."  R19 at 3. Midland opposed that request, on the ground that METC had not shown good cause.  R20 at 2-3.  Moreover, it is the filing utility—Consumers, not METC—that must propose an effective date for the Facilities Agreement.  *Duke Power Co.*, 27 FERC  ¶61,160, 61,293 (1984) (explaining that the Federal Power Act "contemplates that, within certain parameters, the filing utility shall initially choose the requested effective date for its rate changes").

In any event, FERC did not waive the notice requirement, and thus did not grant METC's request for a retroactive effective date.  Nor did it find "good cause" that the Facilities Agreement "take effect" without the statutorily-required 60 days' notice.  FERC instead declared in the Facilities Agreement Order that the Facilities Agreement would be effective October 5, 2010.  R21, P2.  METC did not seek rehearing of that ruling.

Rather than seek rehearing of the prospective effective date, METC tried a different tack.  It filed a motion for clarification, asking that FERC "clarify that the non-filing of the Facilities Agreement and the Agency Agreement did not affect the validity and enforceability of those agreements during the period of non-filing."  R26 at 3.  On the same date, METC filed the Agency Agreement for approval, but here again it did not seek a waiver of the advance notice requirement.

R28.  METC instead requested an effective date in December 2010, along with a finding "that [] METC's late filing of the Agency Agreement does not render the service provided under it null and void."  *Id.* at 26.

### 2.    Rates cannot be charged before they are effective.

According to FERC, the absence of a waiver of the notice requirement makes no difference.  In its Omnibus Rehearing Order, FERC asserted that "Midland has confused the effective date for Commission acceptance of a rate filing with the enforceable date of a jurisdictional agreement."  R64, P19.  The significance of the effective date here, in FERC's eyes, is that "it establishes the ending date for time-value refunds ordered due to the late filing of a jurisdictional agreement."  *Id*.  By contrast, "the enforceable date of a jurisdictional agreement is simply the date that the parties to such an agreement agree to perform their identified obligations to each other."  *Id*.  In other words, a utility can charge rates before their approval by FERC.  But this directly contravenes the language of the statute, which prohibits unfiled rates from "go[ing] *into effect*."  16 U.S.C. §824d(d) (emphasis added).

Not surprisingly, therefore, FERC did not cite any provision of the Federal Power Act or any judicial decision to support its argument that a rate under a jurisdictional agreement can take effect before the effective date declared by the agency.  Instead, FERC claimed that it had "developed a policy that both

36

encourages compliance with the prior notice and filing requirements while still ensuring that a utility may collect bargained-for rates prior to the filing of those rates." R48, P27. Under that policy, according to FERC, utilities can charge rates before they are approved by FERC. The price the utility must pay for the late filing of the agreement is to pay interest on the amounts collected from the customer before the rates were approved. *Id.* P28. FERC claims that this policy of allowing the utility to collect from customers, while making it pay interest on charges collected during the period of non-filing, is reflected in *El Paso Elec. Co.*, 105 FERC ¶61,131 at P19 (2003), and FERC's *Prior Notice Order*, 64 FERC ¶61,139, at 61,979 (1993)—but it has never attempted to reconcile this purported policy with the Federal Power Act's specific terms. R48, PP27-28, nn.43-45.

This is fatal to FERC's position. "No matter how 'bedrock' the principle of ISO independence may be, Order No. 888 is merely a regulation. It cannot be the basis for denying the petitioners their rights provided by a statute enacted by both houses of Congress and signed into law by the president." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002). And the statute here plainly states that unfiled rates may not "go into effect." 16 U.S.C. §824d(d).

FERC also mischaracterizes the source of its alleged policy. Neither of the orders it cites discusses a policy of allowing the collection of rates before they are approved. The *Prior Notice Order* merely specifies the *sanction* that the

37

Commission will impose for the late filing, and says nothing about the enforceability of the underlying contract. *See* 64 FERC ¶61,139 at 61,979-80 (discussing the "remedy" of requiring the utility to pay a time-value refund on the amounts paid by the customer). As FERC stated on rehearing, the *Prior Notice Order* "created a new remedy for future violations of the prior notice and filing requirements." 65 FERC ¶61,081 at 61,504 (1993).

Contrary to FERC's contention, the *Prior Notice Order* did not state that jurisdictional contracts are enforceable prior to their effective date. Indeed, fairly read, it rejects the very distinction that FERC is now attempting to make. As this Court explained in *Xcel*, FERC articulated its policy towards waiver of the 60-day prior notice requirement in *Central Hudson Gas Elec. Corp.*, 60 FERC ¶61,106, *reh'g denied*, 61 FERC ¶61,089 (1992). There, "FERC stated that it would generally grant waivers for: (1) 'uncontested filings that do not change rates,' (2) 'filings that reduce rates and charges,' and (3) 'filings that increase rates when the rate change and the effective date are prescribed by contract.'" 510 F.3d at 317. By contrast, "[f]or filings that provide for *new* service, as here, *Central Hudson* gives great weight to whether the agreement was filed before or after the commencement of that service." *Id*. "If the agreement was filed prior to the commencement of service FERC will grant a waiver 'if good cause is shown,' but

if an agreement was filed on or after the day service has commenced, FERC will not grant a waiver '[a]bsent extraordinary circumstances.'" *Id.*

The *Prior Notice Order* did not change this high burden. To the contrary, this Court noted that "FERC expressly reaffirmed … that it would 'not relax the extraordinary circumstances' standard of waiver for any other type of agreement for new service." *Id.*

FERC's Omnibus Rehearing Order never explains why the agency would require extraordinary circumstances to justify a waiver of the notice requirement if the waiver were irrelevant to the enforceability of the agreement. Nor does FERC attempt to reconcile its attempted distinction between when a rate is effective versus when it is enforceable with the Federal Power Act. The answer is they cannot be reconciled.

The Federal Power Act declares that "*no* change [in rates] shall be made by any public utility in any such rate, charge, classification, or service . . . except after sixty days' notice to the Commission and to the public." 16 U.S.C. §824d(d) (emphasis added). The same provision adds that FERC, "for good cause shown, may allow changes to take effect without requiring the sixty days' notice." *Id.* Nowhere does the statute, which repeatedly refers to the date when charges "go into effect" and "take effect," state that charges can be collected before that date *without* a waiver.

**B.    FERC's position is contrary to other orders and the position it has taken before this Court.**

This Court's decision in *Xcel* explored the critical importance of a waiver to the enforceability of a contract.   There, as here, a utility failed to file an interconnection agreement before commencing service.   FERC refused to waive the notice requirement, leading the utility (Xcel) to argue "that FERC's decision not to waive the prior notice requirement … effectively deprived Xcel of the ability to collect those charges at all"—meaning the customer would receive services for free.  *Xcel*, 510 F.3d at 319.  But, recognizing that the contention was a non-starter, Xcel did not even *argue* that the agreements could be enforced absent the waiver— it argued only that FERC erred in refusing to grant the waiver.  *Id*. at 315.[5]

*Xcel* is also notable because of the position FERC did *not* take.   FERC did not argue that Xcel would still be able to collect the amount it alleged was due because unfiled contracts are always "enforceable."   To the contrary, its brief stressed that Xcel's "professed injury" was "wholly of its own making."  *See* R31, Exh. F at 19.   The utility "chose to provide interconnection service under those unauthorized agreements for several years without filing them and without collecting any facilities charges."  *Id.*  METC fits in the same shoes.

FERC's decision in another case is equally at odds with its position here.  In Opinion No. 435, FERC initially concluded that because charges for facilities were

_____

[5]   This Court found no error in the denial of the waiver.  *Id*.

part of enforceable contracts, the rates were "the equivalent of a lawful, effective rate."[6]  FERC later reasoned on rehearing that "if [the rates] had been filed … , it is clear that they would have been grandfathered because there was no challenge to them during the 12 months proceeding [sic] the enactment of the Act."[7]

This Court later reversed, calling into question both Opinion No. 435 and any suggestion in *El Paso Elec. Co.* that contracts can be effective prior to filing absent a waiver.  This Court held FERC's reasoning in Opinion No. 435 to be "fundamentally flawed," as "the Commission may not grandfather unfiled rates on the assumption that if the rates had been filed, no challenge would have been brought.  The Commission may not regulate rates as if they existed in a world that never was.  It must take the rates as it finds them, and here, FERC found them unfiled."  *BP West Coast Prods.,* 374 F.3d at 1274.[8]

On remand, FERC repudiated the notion that unfiled rates are enforceable even if reflected in a consensual bilateral contract.  In *SFPP, L.P.*, FERC held that "SFPP's failure to file the contract charges at issue meant that they were not legal rates under the ICA." 122 FERC ¶61,126 at P6 (2008).  *See also Maislin*, 497 U.S. at 132 ("adherence to unfiled rates[] undermines the basic structure of the Act").

---

[6]  *SFPP, L.P., et al.*, 86 FERC ¶61,022, at 61,076 (1999).

[7]  Opinion No. 435-A, 91 FERC ¶61,135, at 61,502 (2000).

[8]  The court did not reach the issue of whether FERC's decision also would have violated the filed rate doctrine.  *Id.*

As an ALJ ruled in an order upheld by FERC, "SFPP elected at its peril not to file the Watson Station charges with the Commission." *SFPP, L.P.*, 118 FERC ¶63,033, at 66,171 (2007). FERC added that SFPP's "continued reliance on statements in Opinion No. 435 that the contract rates could be binding on the parties even if not filed with the Commission is misplaced."[9] On appeal, this Court affirmed FERC. *SFPP, L.P. v. FERC*, 592 F.3d 189, 193 (D.C. Cir. 2010) (citing *BP West Coast Products* and *Maislin*). The same reasoning applies to the unfiled Facilities Agreement and Agency Agreement.

Midland detailed the *SFPP* chronology in its rehearing petition, R50 at 12-13, but FERC largely ignores it. *See* R64 at PP23-24 (addressing *Xcel* and *BP* but not *SFPP*). Thus, FERC has both failed to "respond meaningfully" to Midland's showing on this point, and to explain its departure from its own prior precedent. Accordingly, its determination warrants no deference. *See PSEG Energy*, 665 F.3d at 208; *Transmission Agency of Northern California*, 495 F.3d at 671; *Williams*, 475 F.3d at 326 ("Reasoned decisionmaking necessarily requires consideration of relevant precedent.").

FERC has also failed to explain why the bottom line of *SFPP* should not apply here: Contract rates cannot be binding if not filed with the agency, and a late filing does not make the contracts effective retroactively absent a waiver. Under

---

[9] 122 FERC ¶ 61,126 at P 8.

the logic of *SFPP*, since no waiver was given, the Facilities Agreement and Agency Agreement cannot be enforced prior to their effective dates.

## C. FERC's concern that denying enforcement would be unjust was misplaced.

FERC's position ultimately rests on two notions—that denying METC reimbursement of its expenses would be unjust, and that METC provided services for which it is entitled to compensation. *See, e.g.,* R64, P22. For several reasons, FERC was wrong.

### 1. METC was on notice of the filed rate doctrine and the necessity of filing.

*First*, both METC and Consumers were on notice of how courts strictly apply the filed rate doctrine. As the Supreme Court stated in *Maislin*, the filed rate doctrine "is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress." 497 U.S. at 127. Not surprisingly, other circuit and district court decisions are uniformly to the same effect. *See Rebel Motor Freight, Inc. v. ICC*, 971 F.2d 1288, 1293 (6th Cir. 1992) (the filed rate doctrine is "strictly applied," and even equitable defenses cannot overcome it); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 488 (8th Cir. 1992) ("[T]he underlying conduct [of the defendant] does not control whether the filed rate doctrine applies."); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 532 (3d Cir. 2006) (refusing to enforce a discount rate to the defendant because the

43

contract was never filed with the agency); *Sancom, Inc. v. Qwest Commc'ns. Corp.*, 643 F. Supp. 2d 1117, 1125-27 (D.S.D. 2009) (filed rate doctrine trumped consideration of whether defendant received a service for which it was not paying).

*Second*, both Consumers and METC were on notice of the need to file the Facilities and Agency Agreements for almost two decades. As FERC explained in the Facilities Agreement Clarification Order, the 1993 *Prior Notice Order* affirmed "that it had always had jurisdiction over interconnections that permit third-party sales." R48, P25. FERC rejected Consumers' contention that the filing obligation was not clear before the agency's decision in *Niagara Mohawk*, 121 FERC ¶61,183 (2007). *Id.* And notice of the duty to file came not just from other parties' cases—in 2002, FERC specifically directed Consumers and METC themselves to "file … all applicable agreements." *Trans-Elect, Inc. et al.*, 98 FERC ¶61,142 at Ordering Paragraph M (2002). Both entities ignored that order.

### 2.    METC had no right to be reimbursed for its expenses.

*Third*, under FERC policy, Midland has no obligation to pay property taxes or operation and maintenance expenses on the METC transmission facilities at issue here. Indeed, in Order No. 2003, FERC itself *rejected* a utility's argument "that the Interconnection Customer's obligation to reimburse the Transmission Provider for taxes should cover ad valorem property taxes and other taxes assessed against the Transmission Provider." *Id.* P435 (2003). As FERC recognized, "the

44

proposal that ad valorem property taxes be included in the Interconnection Customer's obligation to reimburse the Transmission Provider for taxes" was legally unsupportable, as "these expenses are annual and are more analogous to operating expenses that are not covered under the LGIA." *Id*. P444.

FERC also agreed that interconnection agreements signed before the effective date of Order No. 2003 would be grandfathered—and thus exempt from the scope of the Order—but *only if* the interconnection agreements were filed with FERC before the 2003 effective date of the Large Generator Interconnection Procedures. *Id.* at P187. Tellingly, FERC did not declare that interconnection agreements that predated Order No. 2003 would be enforceable even if they were not filed. Rather, filing with FERC was a condition precedent to the agreements being accorded grandfathered status. *Id.*

Here, neither the Facilities Agreement nor the Agency Agreement was filed before the Large Generator Interconnection Procedures went into effect. In fact, they were not filed until several years later, well after Midland began refusing to pay METC's invoices. *See* R4; R23; R33, Exh. A ¶¶9-10. Thus, Order No. 2003 should control, and FERC's failure to justify its decision not to follow that Order warrants reversal. *Republic Airline Inc. v. U.S. Dep't. of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) (vacating order that departed from agency's prior precedent, and reasoning that "[o]ne of the core tenets of reasoned decision-making is that an

agency [when] changing its course … is obligated to supply a reasoned analysis for the change"); *Missouri Pub. Serv.*, 601 F.3d at 582 (granting petition for review and vacating challenged portion of order where FERC action was "plainly inconsistent with its own precedents"); *Transmission Agency of Northern California*, 495 F.3d at 671; *Williams*, 475 F.3d at 326.

A related FERC policy bars METC from looking to Midland to reimburse METC for property taxes and operating and maintenance expenses incurred in connection with METC's transmission facilities.  In numerous orders dating back to the 1980s, FERC has held that expenses incurred in upgrading transmission equipment to facilitate an interconnection are not properly charged to the interconnection customer; instead, they must be allocated among all transmission customers.  *See, e.g.*, Order No. 2003 at P21 (agreements to "directly assign the costs of Network Upgrades to the Interconnection Customer[] have not been found to be just and reasonable and have been rejected by the Commission"); *Consumers Energy Co.*, 96 FERC ¶61,132, at 61,560 (2001) ("The Commission has long held that the integrated grid is a cohesive network whose expansion benefits all users of the grid, and rejected the direct assignment of integrated grid facilities"); *Pub. Serv. Co. of Colo.*, 62 FERC at 61,061 ("The Commission has rejected the direct cost assignment of grid facilities even if the grid facilities would not be installed but for a particular customer's service.").

46

Similarly, FERC consistently has held that operation and maintenance expenses associated with transmission network lines and equipment should be recovered from transmission customers. *See, e.g., New York Indep. Transmission Sys. Operator, Inc.*, 123 FERC ¶61,093 at P46 (2008) ("We further agree with Linden that the System Upgrade Facilities at issue are network facilities, and that as network facilities, NYISO cannot charge only Linden for their operating and maintenance expenses.").

Network facilities include all facilities at or beyond the point where the generator connects to the grid. *Miss. Delta Energy v. Entergy Servs., Inc.*, 119 FERC ¶61,269 at P29 (2007). Generally, the point of interconnection is designated in the parties' contract as where the customer connects to the grid. *Id.* In this case, the property taxes and operation and maintenance expenses were all assessed on the facilities on the METC side of the point of interconnection. R33 at 8, 13-14. Accordingly, METC was demanding that Midland pay charges that were not collectible under FERC's own orders. METC should have looked instead to its transmission customers for payment. For this reason too, there is nothing unjust in requiring strict adherence to the Federal Power Act and the filed rate doctrine.

In sum, as with its failure to follow Order No. 2003, FERC has offered no valid justification for not adhering to its policy on the allocation of transmission network expenses. Reversal is warranted.

**II.    FERC acted contrary to law in excusing the violation of Section 10 of the Facilities Agreement.**

FERC's insistence that Midland had a duty to pay under the Facilities Agreement and Agency Agreement not only violated the Federal Power Act and FERC precedent regarding reimbursable expenses, it also rested on a flawed premise—that Midland had a contractual duty to pay METC under the Facilities Agreement.  But Midland had no contract with METC, and Section 10 of the Facilities Agreement barred Consumers from assigning its rights and duties to other parties without Midland's agreement and without also assigning the Power Purchase Agreement.  R4, Att. A at 29.

FERC realized that it could not honor METC's request for an order directing Midland to pay METC.  In FERC's own words, "it [was] unclear what the contractual basis would be for any such order" since "Midland and [METC] are not both parties to any agreement."  *See* R46 at P21.  FERC tried to avoid this difficulty by declaring that Midland had a duty to pay Consumers, even if the services came from METC.  According to FERC, "under the Facilities Agreement, Midland was entitled to service from Consumers Energy, and Midland indeed received service from Consumers Energy."  R64 at P28.  FERC added that the "Facilities Agreement appears to expressly contemplate that Consumers Energy may engage agents to assist in performing its obligations."  *Id*.

48

### A.    METC was not an agent under Michigan law.

To be sure, one sentence of the Facilities Agreement refers to Consumers and its agents and employees having access to the Connection Facilities and billing meters "for the purpose of installing, operating, maintaining and removing" them. R4, Att. A at 23.  And Midland has not disputed that Consumers could engage agents to carry out discrete tasks under the Facilities Agreement.  But METC did not qualify as an "agent" as that term is understood in the law, which FERC would have realized had it undertook the examination of the Agency Agreement that Midland requested.

To begin with, whether METC is Consumers' agent is a matter of Michigan law—the law to which Midland and Consumers agreed in Section 11 of the Facilities Agreement.  And under Michigan law, "[t]he parties' designation of the relationship"—here, Consumer's characterization of METC as its agent—"is not controlling."  *Wolverine World Wide, Inc. v. Wolverine Canada, Inc.*, 653 F. Supp. 2d 747, 763 (W.D. Mich. 2009); *see also Universal Life Church, Inc. v. Comm'r of Lottery*, 292 N.W.2d 169, 170 (Mich. Ct. App. 1980) ("The label which the parties themselves place on their relationship is not determinative").  FERC thus erred in deferring to Consumers' nomenclature.

FERC also failed to realize that METC could not be an agent because Consumers retained little, if any, control over METC's actions.  "The test of

whether an agency has been created is whether the principal has a right to control the actions of the agent." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992). Even FERC has recognized this concept: "In all the law of agency there can hardly be a more fundamental principle than the one that requires, as a condition to the existence of a principal-agent relationship, that the principal have a right of control over the agent." *New England Power Co.*, 27 FERC ¶63,037, at 65,159-60 (1984), (Initial Decision), *rev'd on other grounds*, 31 FERC ¶61,047 (1985).

Here, however, there was no such control. *First*, as a practical matter, METC would necessarily dictate how the interconnection between Midland's generation plant and the electric grid was maintained because METC *owned* all of the necessary transmission lines and equipment, having acquired these assets from Consumers. R46, P5. This contrasts with the typical principal-agent relationship, where the agent manages property owned by the principal. *See Hart v. Comerica Bank*, 957 F.Supp. 958, 978 (E.D. Mich. 1997) (Michigan courts look to factors including "whether the alleged principal provided the materials and place of work for the alleged agent" in determining whether "control" exists).

*Second*, the Agency Agreement did not call for Consumers to direct METC's actions. Although FERC emphasized the duties that Consumers retained under the Agency Agreement, R64 at P28, they were minimal, involving only the

maintenance of the connection between Midland's generator and the Dow Chemical plant and the attendant billing meters.  *See* R23, Att. B at 3 and 5. METC otherwise was "delegated the full scope of operating authority Consumers possesses…"  *Id.* at 3.  Indeed, the contract went on to provide that METC "shall enjoy *all* of Consumers' rights under [Section 3.3 of the Facilities Agreement] and shall perform *all* of Consumers' obligations…"  *Id.* at 4 (emphasis added).

Article II identifies over eight critical duties that METC assumed, none of which were subject to Consumers' oversight.   METC's authority included adding to or modifying existing facilities, with the promise to METC of receiving ownership and title to such additions or modifications (Section 1); relocating the facilities if necessary (Section 2); dictating voltage levels (Section 6); monitoring and calibrating Midland's protective devices and control systems (Sections 5, 7, and 10); and retiring facilities (Section 18).  R23, Att. B at 3-6.  In short, what the Agency Agreement really represented was an assignment.

The distinction between an agent and an assignee is critical under the Facilities Agreement.  Any assignment was expressly forbidden by Section 10 of that Agreement, which required Midland's consent to any transfer and invalidated any assignment "unless the Power Purchase Agreement is also assigned in the same manner at the same time."  R4 Att. A at 29.

Consumers was unwilling, however, to assign the Power Purchase Agreement—a point it expressly acknowledged in the recitals to the Agency Agreement. R4, Att. C at 2. Instead, Consumers chose to designate METC as its "agent" to carry out almost all of its duties under the Facilities Agreement. *Id.* at 3-4. Put bluntly, Consumers and METC attempted to circumvent Section 10, as Midland has urged all along. *See, e.g.*, R13 at 13 (describing the Agency Agreement as a "ruse" to "circumvent the anti-assignment provision of the Facilities Agreement"); R50 at 17 (asserting that "[i]f the Commission's repeated references to METC as Consumers' agent was intended to suggest a finding that the Agency Agreement was not a breach of the anti-assignment provision of the Facilities Agreement, such a finding would have no support in the record.").

## B. FERC failed to analyze whether METC was an assignee or an agent.

Rather than analyze whether METC should be viewed as an assignee rather than an agent, FERC tried to sidestep the issue. Initially, it suggested that Midland had waived any protest by not suing Consumers. *See* R46 at P23 ("Midland has not filed any complaint against Consumers Energy based on the alleged contract violation…"). But after Midland challenged that suggestion on rehearing, FERC disclaimed any finding of waiver. Instead, the agency summarily declared that because Midland had "received service from Consumers Energy," it "was and is

52

obligated to pay for that service."  R64 at P28.  But Consumers never sought payment—METC was the only claimant.

Indeed, the fact that METC was filing complaints in state court and with FERC is further evidence that it was not a true agent.  Only principals have standing to sue under Michigan law.  *State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 269 & n.10 (6th Cir. 1979); *see also* 3 Am. Jur. 2d Agency § 95 ("The mere fact that an agent has the authority to receive payment does not give the agent the authority to institute a legal proceeding…").  But while Midland raised this point on rehearing, FERC, having no answer, chose to ignore it.  This too was reversible error.  *PSEG Energy*, 665 F.3d at 208; *PPL Wallingford Energy v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) ("We have stressed that unless the agency answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.") (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001)) (internal quotations and punctuation omitted).

Putting aside the legal error in FERC's characterization of METC as an "agent," its summary conclusion was unmoored to any discussion of specific provisions of the Agency Agreement.  This was an abdication of FERC's duties as a regulator, particularly when Midland had requested such a review.  *See, e.g., Bangor Hydro-Elec. Co. v. FERC*, 925 F.2d 465, 468 (D.C. Cir. 1991) (excusing

FERC failure to examine whether contract provided firm service because party had not provided it with copy of the contract); *compare Pub. Serv. Comm'n v. Panda-Brandywine, L.P.*, 825 A.2d 462 (Md. 2003) (holding, after extensive review of applicable contracts, that agency agreement constituted violation of anti-assignment clause in power purchase agreement).  This Court should reverse.

### III.   FERC arbitrarily refused to address that the charges at issue are not recoverable under prior FERC orders.

As shown above, METC has no right to demand that Midland pay the property taxes and operation and maintenance expenses associated with METC's transmission lines and equipment.   Such expenses must be recovered from transmission customers, rather than the interconnecting generation plant operator.  Further, before the agency Midland also questioned whether METC was already recovering the expenses from transmission customers, meaning that it was seeking a double recovery.  R31 at 16.  Yet FERC refused to address any of these defenses and Midland's counterclaim, reasoning that Midland was making a collateral attack on the Facilities Agreement Order.  R47, P18.  According to FERC, Midland had an obligation to seek rehearing of that Order, and its failure to do so barred it from raising any defense touching on the justness and reasonableness of the rates in the Facilities Agreement.

This was error, as Midland was not aggrieved by the Facilities Agreement Order—and thus had no obligation to seek rehearing of it.  As discussed in the

jurisdictional statement (at 5), this Court has required a party to seek rehearing only when it is injured by FERC's order. *See Alcoa*, 564 F.3d at 1346 (agreeing with Alcoa that it was not "imminently aggrieved" by prior order and that Alcoa's request for rehearing of a later order was not a collateral attack on prior order). Even an aggrieved party "need not seek review if it is satisfied with the practical impact of the order; and that does not foreclose its ability to challenge the principle as beyond the agency's statutory authority when the agency later utilizes it to cause substantial injury." *Niagara Mohawk*, 452 F.3d at 827. And here, Midland suffered no injury from the Facilities Agreement Order.

Nor could it have. When Consumers filed the Facilities Agreement, it did not seek retroactive approval of such charges. Instead, it requested an effective date of October 5, 2010, consistent with the Federal Power Act. *See* R4 at 1. Going forward, approval of the Facilities Agreement meant that Consumers could continue to charge Midland for expenses associated with the connection of the Midland plant to the Dow Chemical plant. Because such charges do not pertain to transmission lines and equipment—and thus may be assessed against individual customers—they are properly reimbursable under Order No. 2003.

By contrast, acceptance of the Facilities Agreement would not give METC any rights going forward. In the Facilities Agreement Order, FERC had agreed with Midland that METC was required to file the Agency Agreement for FERC

review.  R21, P27.  Midland reasonably expected that METC's right to future

payments would be litigated when Midland protested that filing.

In addition, the Facilities Agreement Order accepted the new generator

interconnection agreement.  R21, P1.  A recital in the agreement stated that

Midland and METC "agree to have the Facilities Agreement terminated in its

entirety or amended to terminate the interconnection service it currently provides,

and agree that upon the termination or amendment of the Facilities Agreement this

new Agreement will define the rights of each of them in regards to the

interconnection facilities."  R1, Tab A at 2.  In the Facilities Agreement Order,

FERC accepted the filing of the generator interconnection agreement, conditioned

on amendment or termination of the Facilities Agreement.  R21, P1.  FERC added

that if Consumers and Midland chose to amend that Agreement, they would "need

to remove from [it] any and all language pertaining to the interconnection service."

R21, P35.[10]  Thus, Midland reasonably expected that under no scenario would

METC have any claim for reimbursement going forward.[11]

---

[10]  FERC incorrectly suggested that Midland opposed termination or amendment of
the Facilities Agreement's provisions governing interconnection service.  R21 at
P34.  In reality, Midland asked for the relief that FERC ultimately granted.  R13 at
12 (arguing that the Facilities Agreement should be accepted "only to the extent it
does not relate to interconnection services"); R21 at 35 (giving Midland the option
to have its interconnection service governed by the new generator interconnection
agreement submitted by the Midwest Independent Transmission System Operator).

[11]  As it turned out, Consumers refused to either amend or terminate the Facilities
Agreement for another year.  In 2011, Consumers sought FERC consent to

Nor did the Facilities Agreement Order validate METC's claim for past property taxes or operation and maintenance expenses. FERC accepted the Facilities Agreement for filing effective October 5, 2010, and thus *denied* METC's request that the Facilities Agreement be declared effective retroactive to the date it was first subject to FERC's jurisdiction (*i.e.*, back to 1988). R21 at P2. FERC also refused METC's request for an order directing Midland to pay METC.

In short, the Facilities Agreement Order essentially gave Midland what it wanted, and it gave METC *none* of the relief it sought. As a result, there was nothing for Midland to appeal,[12] and it was *METC* who felt aggrieved by the Facilities Agreement Order and thus moved for clarification or rehearing. METC's motion did not seek rehearing of the prospective effective date, but rather sought a declaration that "the non-filing of the Facilities Agreement and the Agency Agreement did not affect the validity and enforceability of those agreements during the period of non-filing." R26 at 3.

---

termination of the Facilities Agreement. FERC first agreed, *Consumers Energy Co.*, 139 FERC ¶61,014 (2012), but later reversed itself, holding that the effective date of the cancellation hinged on when Midland installed new billing meters, *Consumers Energy Co.*, 142 FERC ¶61,193 at PP44-45.

[12] Indeed, FERC likely would have denied a rehearing petition by Midland. *See Duke Elec. Transmission*, 96 FERC ¶61,145, at 61,627 (denying a request for rehearing because the petitioner was not aggrieved by the order as required by 16 U.S.C. § 825*l*(a)).

In opposing that motion, Midland raised the defenses that the Facilities Agreement and Agency Agreement were not enforceable because they violated Order No. 2003 and FERC's policy regarding the direct assignment of transmission network charges. R31 at 6-7, 12-15. Yet FERC refused even to entertain Midland's opposition before granting METC's motion for clarification.

Midland had no reason to assert these defenses sooner. Midland was never on notice that it had to protest the terms of the Facilities Agreement—an agreement to which METC was not even a party—to defend itself against METC's demand for reimbursement under the Agency Agreement. Although FERC later insisted that METC's right to payment derives exclusively from the Facilities Agreement, R47, P7, METC itself suggested otherwise. *See, e.g.*, R23 at 2 (requesting a "specific determination that Midland must reimburse … costs to METC as METC has provided services under the Agency Agreement and the Facilities Agreement"). METC also noted in its petition for declaratory order that there were "three types of charges stemming from the Agency Agreement." *Id.* at 13. METC explained that those three types were a $500 monthly fee paid by Consumers, reimbursement for property taxes, and reimbursement of operating and maintenance charges. *Id.*

After Midland protested the filing of the Agency Agreement and METC's petition for a declaratory order, METC changed course. Confronted with

Midland's defense that the expenses were not reimbursable under FERC precedent, METC claimed that its right to payment actually derived from the Facilities Agreement. R37 at 3-4.[13]  FERC agreed.  It held that the Facilities Agreement established all relevant rates, and that the defenses Midland raised were an impermissible collateral attack on the Facilities Agreement Order in which FERC found the rates to be just and reasonable.  R41, P9.

Putting aside FERC's game of "gotcha," its insistence that all relevant rates were set by the Facilities Agreement is wrong.  FERC claimed that the only rate set forth in the Agency Agreement was the $500 monthly fee payable by Consumers to METC.  However, in the same paragraph in which the $500 monthly fee is specified, the Agency Agreement states that "METC or other Downstream Owner shall be entitled to the payments from Seller [Midland] pursuant to the Subject Agreement [the Facilities Agreement] as specified in Article II of this Agency Agreement except as otherwise provided in Section 11 thereof."  R23, Att. B at 6. Article II divides the right to reimbursement between METC and Consumers, with the latter reserving the right to reimbursement for expenses incurred in connection

---

[13]    In another proceeding before FERC, involving a similar agency agreement, METC argued the opposite, stating that "The Agency Agreements <u>always</u> supplied the terms pursuant to which Michigan Transco provided O&M services related to the transmission of electric energy in interstate commerce."  Motion for Leave to Answer and Answer of Michigan Electric Transmission Co., Docket Nos. ER11-4127-000 *et al.* (filed Sept. 1, 2011) at 6.

with Dow Chemical meters (and related interconnection facilities).  R23, Att. B at

3, 5.  METC itself invoked this provision as the basis for payment.[14]

FERC also erred in finding that METC could rely on rates approved for

Consumers in the Facilities Agreement.  FERC's longstanding policy is that

utilities cannot incorporate rates by reference or rely on rates approved in other

contexts.  *See, e.g., Southwestern Pub. Serv. Co.*, 81 FERC ¶61,384, at 62,792

(1997) (a public utility cannot avoid a section 205 filing simply by incorporating

by reference the terms and conditions of a tariff already on file with the

Commission); *Detroit Edison Co*., 78 FERC ¶61,149, at 61,628 & n.3 (1997)

("[T]he Commission consistently has rejected proposals to define rates, terms and

conditions for service under one rate schedule solely by reference to a different rate

schedule.").  Because METC had to make its own rate filing, and could not simply

rely on rates that were approved for Consumers, FERC erred in not addressing

whether METC's charges were reimbursable under FERC precedent.

---

[14]   *See* R23 at 3 ("The Agency Agreement provides that METC will be reimbursed its costs in carrying out the O&M activities, including certain tax obligations.").

## CONCLUSION

For the foregoing reasons, this Court should grant review, reverse FERC's conclusion that the Facilities Agreement and Agency Agreement can be enforced before their effective dates, and hold that the rates under the agreements cannot be charged before those dates.  The Court also should reverse FERC and hold that the Agency Agreement was an invalid assignment.  Last, the Court should remand with instructions to FERC to consider whether the charges for which METC seeks reimbursement are reimbursable under Order No. 2003 and FERC's precedent on the direct assignment of transmission network charges.  If FERC finds that the charges are not reimbursable, it also should be directed to address Midland's counterclaim.

Respectfully submitted,

/s/ Gordon A. Coffee
GORDON A. COFFEE
RAYMOND B. WUSLICH
STEFFEN N. JOHNSON
ERICA E. STAUFFER
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, D.C.  20006*
*Tel:  (202) 282-5000*
*Email:  gcoffee@winston.com*

*Attorneys for Midland Cogeneration*
*Venture Limited Partnership*

Dated:  July 10, 2014

61

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,986 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit R. 32(a)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14-point Times New Roman font.

<u>/s/ Gordon A. Coffee</u>
Gordon A. Coffee
*Attorney for Appellant Midland Cogeneration Venture Limited Partnership*

Dated:  July 10, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2014, I electronically filed the foregoing Opening Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit.  I have this day served the foregoing upon the counsel listed in the Service Preference Report, via email (through the Court's CM/ECF system) or U.S. Mail, as indicated below:


Karin L. Larson                                                Email
Federal Energy Regulatory Commission
(FERC) Office of the Solicitor
888 First Street, NE
Washington, DC 20426
Email: Karin.Larson@ferc.gov


Andrew Mark Jamieson                                  Email
ITC Holdings Corporation
27175 Energy Way
Novi, MI 48377
Email: ajamieson@itctransco.com


Deborah Ashby Moss                                     U.S. Mail
Consumers Energy Company
1730 Rhode Island Avenue, NW
Suite 1007
Washington, DC 20036-0000
Email: damoss@cmsenergy.com


Robert M. Neustifter                                      Email
Consumers Energy Company
Room EP11-233
One Energy Plaza
Jackson, MI 49201-0000
Email: robert.neustifter@cmsenergy.com

James Roush                                 Email
Consumers Energy Company
EP11-240
One Energy Plaza
Jackson, MI 49201-0000
Email: james.roush@cmsenergy.com

Robert Harris Solomon                       Email
Federal Energy Regulatory Commission
(FERC) Office of the Solicitor
Room 9A-01
888 First Street, NE
Washington, DC 20426
Email: robert.solomon@ferc.gov

John R. Staffier                            Email
Stuntz, Davis & Staffier, PC
555 Twelfth Street, NW
Suite 630
Washington, DC 20004-0000
Email: jstaffier@sdsatty.com

Matthew Ryan Dorsett                        Email
MISO
720 City Center Drive
Carmel, IN  46032
Email:  MDorsett@misoenergy.org

                                    /s/ Gordon A. Coffee
                                    Gordon A. Coffee
                                    *Attorney for Petitioner Midland
                                    Cogeneration Venture Limited
                                    Partnership*

Dated:  July 10, 2014

# STATUTORY

# AND

# REGULATORY

# ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

**Item** `                                                                                          **Page**

Federal Power Act Section 205,
    16 U.S.C. § 824d(a), (d), and (e) ....................................................................A1

18 C.F.R. § 35.11 ................................................................................................A3

**16 U.S.C. § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**
All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

. . .

**(d) Notice required for rate changes**
Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**
Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.  If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the

end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**18 C.F.R. § 35.11 Waiver of notice requirement.**

Upon application and for good cause shown, the Commission may, by order, provide that a rate schedule, tariff, or service agreement, or part thereof, shall be effective as of a date prior to the date of filing or prior to the date the rate schedule or tariff would become effective in accordance with these rules. Application for waiver of the prior notice requirement shall show (a) how and the extent to which the filing public utility and purchaser(s) under such rate schedule or tariff, or part thereof, would be affected if the notice requirement is not waived, and (b) the effects of the waiver, if granted, upon purchasers under other rate schedules. The filing public utility requesting such waiver of notice shall serve copies of its request therefor upon all purchasers.

A3